Filed 5/18/22  P. v. Novela CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SERGIO NOVELA,<br><br>Defendant and Appellant. | F073275<br><br>(Super. Ct. No. MCR046874)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Brook A. Benningson, and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following consolidation of five separate cases arising out of events on five different dates, a jury convicted Sergio Novela (defendant) as follows:

*Count 1*:  First degree murder, committed for the benefit of a criminal street gang, during the commission of which a principal personally used and discharged a firearm, proximately causing great bodily injury or death.  (Pen. Code,[1] §§ 186.22, subd. (b)(5), 187, subd. (a), 12022.53, subds. (b)-(e)(1).)

*Count 2*:  Discharge of a firearm from a motor vehicle at another person, committed for the benefit of a criminal street gang.  (§§ 186.22, subd. (b)(1)(B), 26100, subd. (c).)

*Count 3*:  Premeditated attempted murder, committed for the benefit of a criminal street gang, during the commission of which a principal personally used and discharged a firearm.  (§§ 186.22, subd. (b)(5), 187, subd. (a), 664, 12022.53, subds. (b), (c) & (e)(1).)

*Count 4*:  Assault with a firearm, committed for the benefit of a criminal street gang.  (§§ 186.22, subd. (b)(1)(B), 245, subd. (a)(2).)

*Count 5*:  Active participation in a criminal street gang.  (§ 186.22, subd. (a).)

*Counts 6 through 9*:  Unlawful possession of a firearm, committed for the benefit of a criminal street gang.  (§§ 186.22, subd. (b)(1)(A), 29800, subd. (a)(1).)

*Counts 10 through 13*:  Unlawful possession of ammunition, committed for the benefit of a criminal street gang.  (§§ 186.22, subd. (b)(1)(A), 30305, subd. (a)(1).)

*Count 14*:  Active participation in a criminal street gang.  (§ 186.22, subd. (a).)

*Count 15*:  Assault by means of force likely to produce great bodily injury, committed for the benefit of a criminal street gang.  (§§ 186.22, subd. (b)(1)(A), 245, subd. (a)(4).)

*Count 16*:  Active participation in a criminal street gang.  (§ 186.22, subd. (a).)

---

[1] All statutory references are to the Penal Code unless otherwise stated. Defendant's surname is shown as "Novella" in some portions of the record.

2.

*Counts 17 through 19*:  Resisting and attempting to deter an executive officer in the performance of his duty.  (§ 69.)[2]

Following a bifurcated court trial, defendant was found to have been released from custody on bail or own recognizance when he committed counts 6 through 14 (§ 12022.1), and he was found to have suffered two prior convictions for serious felonies (§ 667, subd. (a)(1)) that were also strikes (*id*., subds. (b)-(i)).  He was sentenced to a lengthy prison term and ordered to pay various fees, fines, and assessments.

In our original opinion, we held:  (1) The charges arising out of the five cases were properly tried together; (2) Any error in admission of calendar entries found on a third party's cell phone was harmless; (3) Substantial evidence supports defendant's convictions on counts 6, 7, 11, and 12; (4) Defendant is not entitled to reversal of the premeditation finding on count 3; but (5) Defendant is entitled to a remand for resentencing on counts 6 through 9 and 15; to have the trial court exercise its discretion whether to strike the section 12022.53 enhancements imposed with respect to counts 1 and 3; and to have the trial court exercise its discretion whether to strike the enhancements imposed pursuant to section 667, subdivision (a)(1).  Accordingly, we affirmed the convictions, but remanded the matter for limited resentencing.

Defendant petitioned the California Supreme Court for review, arguing in part that the finding of premeditation and deliberation on count 3 (attempted murder) should be reversed because the jury was permitted to rely on a coperpetrator's mental state for that finding under the natural and probable consequences doctrine.  The state high court granted review (S254107), and transferred the matter to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill No. 1437 (2017-2018 Reg. Sess.),

---

[2] The jury found not true, as to counts 17 through 19, that the offense was committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1)(A).)  Although the second amended information did not contain such an allegation with respect to count 19, the allegation was submitted to the jury.

3.

statutes 2018, chapter 1015 (Senate Bill No. 1437), which amended sections 188 and 189 and added section 1170.95.

Pursuant to the California Supreme Court's order, we vacated our prior opinion and reconsidered the cause in light of Senate Bill No. 1437. In our second opinion, we reversed the conviction on count 3, vacated the sentence in its entirety, and remanded the matter for further proceedings and/or resentencing. In all other respects, we adhered to our original analyses and conclusions.

The Attorney General then petitioned the California Supreme Court for review, asking the state high court to resolve a split of authority among the Courts of Appeal regarding the application of Senate Bill No. 1437 to convictions for attempted murder.[3] The state high court granted review (S260228), and transferred the matter to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill No. 775 (2021-2022 Reg. Sess.), statutes 2021, chapter 551 (Senate Bill No. 775), which amended section 1170.95.

Pursuant to the California Supreme Court's order, we vacated our prior opinion. The parties submitting briefing on the effect of Senate Bill No. 775 and we solicited further briefing on legislation passed in the most recent legislative session. We now reconsider the cause in light of Senate Bill No. 775 and Assembly Bill No. 333 (2021-2022 Reg. Sess.), statutes 2021, chapter 699 (Assembly Bill No. 333). We reverse the convictions on counts 3, 5, 14, and 16; the true findings as to the gang enhancements on counts 1 through 4, 6 through 13, and 15; and the true findings as to the gang-related firearm enhancements on counts 1 and 3. We vacate the sentence in its entirety and remand the matter for further proceedings and/or resentencing. In all other respects, we adhere to our original analyses and conclusions.

---

[3] Defendant also petitioned the state high court for review, but his petition was denied.

# FACTS[4]

## I

### PROSECUTION EVIDENCE

### *The Gang Expert's Testimony*[5]

Senior Deputy Probation Officer Aguilera of the Madera County Probation Department testified as the prosecution's gang expert. He explained that the Norteño and Sureño criminal street gangs are rivals. The Mexican Mafia prison gang are the leaders of the entire organization of all Sureños, while the Nuestra Familia are the leaders of the Norteños.

In both gangs, someone moves up in the ranks by "putting in work," i.e., committing crimes for the gangs. The more violent and numerous the crimes, the quicker and higher the individual advances. Similarly, the more respect a gang member gets, the higher up he advances. A gang member gets respect by committing acts for the gang. The more numerous and violent the acts, the more respect. Respect gives a person influence within the gang. Some of the primary activities of the Sureño criminal street gang are murder, attempted murder, possession of firearms, assaults, and drug sales.

Committing violent crimes benefits gangs by instilling fear in the community. The community is less likely to report gang crimes, which allows gangs to continue with their gang business. It is also a good recruitment tool, because a youngster who wants to

---

[4] Dates in the statement of facts are from the year 2013, and all law enforcement personnel are from the Madera Police Department or Madera County Sheriff's Department, unless otherwise stated.

For purposes of clarity and privacy, we refer to some individuals by their initials or first names and initials. No disrespect is intended.

[5] The prosecutor called the People's gang expert as a witness early in her case, to testify concerning Norteño and Sureño criminal street gangs in general and those gangs in Madera. She then recalled him to testify with respect to specific events. We follow the same basic organization.

join a gang will want to join the gang with the most power and respect. Gang members talk with members of their own gang about crimes they commit. They communicate and brag in different ways, including sometimes through rap lyrics. Active Sureños and Norteños are not allowed to cooperate with law enforcement or testify in court, however. If they do, they can be assaulted or killed.

Crimes are more valuable depending on how violent they are and if they are committed against rival gang members. The more violent the crime, the greater the individual's reputation within the gang. When the crime is committed against a rival gang member, it shows the individual is taking on the competition, since the gangs are competing over "turf" — the areas of a city in which they want to conduct their gang business. In Madera, the area of Road 29-1/2 and Avenue 13-1/2, and the area between Ward Street past Cronin Street to Road 28-1/4 and Road 28-1/2, is Norteño territory. The area near Avenue 13-1/2 to Road 28 is Sureño territory. The location of Bill's Kwik Stop is a combination, with the gangs fighting over that territory.

Sureños associate with the color blue and number 13, while Norteños associate with the color red and number 14. "[S]craps" is a derogatory term Norteños use to refer to Sureños; "chapete" and "buster" are derogatory terms used by Sureños toward Norteños. There are many subsets within the Sureños. Subsets are different gangs that come from different areas or neighborhoods. In Madera, the various Sureño subsets get along and work together. Vatos Locos Sureños is one such subset in Madera. Another is Pocos Pero Locos. Money from drug sales, robberies, and other crimes is given to someone within the subset, who then pays a portion to the Mexican Mafia or Nuestra Familia, depending on the gang. This is called "paying taxes."

"Southside for life" is a motto Sureños use to mean that once someone becomes a Sureño, that person is considered to be a Sureño for life, and the gang comes before everything else. "Do you bang" is a term used by gang members when they perceive

someone to be a rival gang member. Depending on the response, action may be taken. "[E]se" is a term Sureños call each other. Norteños also use the term to identify Sureños.

Aguilera had known defendant since approximately 2006 or 2007, when defendant attended secondary school. Aguilera had also had at least three separate contacts with defendant as an adult. In Aguilera's opinion, defendant was an active participant in the Sureño criminal street gang from 2010 to the time of trial. Aguilera based this opinion on defendant's numerous gang-related tattoos, some of which signified he was a member of the Playboy Sureños (also known as PBS) subset; the fact he yelled "Southside for life" when contacted by Fresno police; his identification as such by the Madera Police Department, the Madera County Sheriff's Department, the probation department, and the Department of Corrections; his association on numerous occasions with other Sureño gang members; photographs of him wearing gang clothing and flashing gang signs; and his possession of gang-related rap lyrics. Defendant's gang moniker was L-Nutty.

*Evidence Related to Events of March 21 (Counts 1 & 2)*

About 9:30 p.m. on March 21, Robert Moreno, Ramon M., Julio S., Christian E., and David O. left David's house in the 29000 block of Avenue 13-1/2 to walk to Bill's Kwik Stop to get some items. They were walking westbound on Avenue 13-1/2 when they saw a four-door car, possibly a 1998 or 1999 Honda Accord or Acura, coming east toward them.[6] The car was going normal speed, then slowed when it got close to them. The windows on the passenger side were halfway down. Ramon believed there were three people inside, although there could have been more. He could not make out anyone's face.

---

[6] Ramon described the car as bluish-turquoise. David told police the car was dark blue, although he actually thought it was black. He did not know what make of car it was. Christian described the car as a baby blue or gray Honda Accord EX. He had seen it other times. He believed it belonged to someone named Abi who went to his school and who, Christian had heard, was a gang member. Christian was not sure this was the same car, however.

7.

When the car started slowing down, a bottle was thrown from the front passenger side. It struck David in the leg or groin. Everyone turned to look. A shot was fired from the backseat of the car, and the bullet struck Moreno. Everyone ran. The people in the car were yelling something.

F.C., who lived nearby, saw the car and heard the gunshot. The young men carried the victim to F.C.'s yard, and F.C. called 911. While deputies were attending to the victim, F.C. saw the car pass slowly by two more times. It appeared to him to be a brownish-purple Honda, perhaps about a 1993 model. He told a detective the car was traveling at a speed of two to three miles an hour, as if the occupants were looking for the group of young men a second time.

Moreno died in the emergency room. He suffered a single gunshot wound to the upper right side of the chest. The bullet passed through the lung and exited lower, in the midline of the back. The bleeding caused the lung to collapse, which in turn caused Moreno to go into a deep enough state of shock to cause his death. Although the bullet's caliber could not be determined, it was in the medium to large range. Nine-millimeter, .38-caliber, and .357-caliber rounds were consistent with that size.

Detective Blehm responded to the emergency room, where he viewed the body and came in contact with Christian, Ramon, David, and Julio. Ramon was wearing a San Francisco Giants sweatshirt. Blehm knew the San Francisco Giants to be one of the sports teams the Norteño street gang has adopted as a symbol. Ramon also had a tattoo in the shape of California. In the upper part was a star, which Blehm recognized from his training and experience as the northern star. Below the star was the head of a bear with red eyes. The northern star on the State of California, combined with the red eyes, caused Blehm to opine the tattoo indicated Norteño gang affiliation.[7] The exterior of

---

[7] Ramon denied any gang affiliation and testified he was wearing a blank black sweater, although he did have a San Francisco Giants tattoo on the left side of his

Ramon's cell phone was decorated in red, and the phone contained photographs of people, some of whom appeared to be family members, and many of whom were wearing a lot of red clothing. The phone contained a text message from someone identifying himself as Christian. The message asked the recipient to tell a person Blehm knew to be the head of Varrio Northside Madera, a Norteño subset, to be careful. This person lived a short distance from where the incident occurred, in an area Blehm knew to be a Norteño stronghold. The message warned that "Knox Street" — Varrio Knox Street, a Sureño subset — might be nearby. In addition, Moreno had been wearing red shorts.

Blehm subsequently interviewed Moreno's companions. David said the group was walking westbound on Avenue 13-1/2, when a four-door car approached them from the front. As it neared them, it slowed down and both the front and rear passenger windows were rolled down. David saw three silhouettes of heads in the car, two in the front and one on the right hand side in the back. The front passenger threw a beer bottle out of the front passenger window, and it struck David in the upper leg. The bottle fell to the ground. Shortly after, a single shot was fired from the rear passenger seat of the vehicle. David saw the gun barrel and thought, based on its size, it was probably a handgun. The car then drove away, heading eastbound on Avenue 13-1/2. As David and his companions were running, Moreno said he had been shot and fell to his knees. David and the others picked him up, and the man at the nearby house told them to bring him there. David indicated Ramon was known for being gang affiliated.

No shell casings or projectiles were recovered from the scene. However, a beer bottle was found near the edge of Avenue 13-1/2 at the southeast corner of Avenue 13-1/2 and Cronin. Although the location was dusty, the bottle was clean and did not appear to have been there for long. No other beer bottles, broken or intact, were found in

neck. To Ramon's knowledge, none of the group he was with that night had any gang affiliation.

9.

the area. The bottle bore a print from defendant's right middle finger.[8] Two other latent prints were found on the bottle; they were inconclusive as to (meaning they could not identify or exclude) defendant. It could not be determined when any of the prints were placed on the bottle. DNA found on the mouth of the bottle came from a male, but did not match defendant's DNA profile.

On April 2, Detective Davis showed a photograph to F.C. of a brown 1997 Honda Accord sedan.[9] F.C. said the color of the vehicle was the same as the vehicle he witnessed on the night of the shooting. He remembered more of a square body style than the vehicle in the photograph, however. When Davis searched the vehicle that same day, he found a white sock tied in a knot underneath the driver's seat, in the area where the rear passenger's feet would be. Inside the sock were eight live nine-millimeter Luger rounds.

Defendant was arrested for murder several months later. The next day, there was a front page article in the Madera Tribune about defendant's arrest, along with a photograph of defendant. One copy each of the Fresno Bee and Madera Tribune newspapers were distributed daily to each module of the Madera jail, including the Sureño module in which defendant was housed. The Madera Tribune with the article about defendant was found, during a cell search, with "L-Nutty got Dibs PBS X3" written

---

[8] In April 2014, the People moved to be permitted to photograph and refingerprint defendant, as it could not be determined, for evidentiary purposes, who took the prints of defendant that already were on file. Before the motion could be heard, defendant cut his finger with a razor blade deeply enough that he required stitches. Although defendant denied injuring himself on purpose, the cut resulted in a large scar that ran through the middle of the print on defendant's right middle finger. This did not prevent defendant's fingerprints from being taken or recompared to the prints on the beer bottle, however. That recomparison again showed a match between one of the prints on the bottle and defendant's right middle finger.

[9] This was the vehicle defendant was driving following the shooting on March 29, described *post*.

10.

above the headline.  This indicated to Blehm that defendant was taking credit and assuming responsibility for Moreno's murder.  Although "got Dibs" was not a gang phrase, it was widely accepted as slang indicating the claiming of ownership or credit for something.  "L-Nutty" was defendant's moniker.  "PBS" signified Playboy Sureños, and "X3" symbolized the number 13.

Aguilera explained that the area in which the homicide occurred lay between a predominantly Sureño area and a predominantly Norteño area.  There was a turf war for the area.  This meant that when the rival gangs saw each other, they would try to take control of that turf by violent means.  If a gang member was driving down the street and saw someone wearing colors he perceived to be colors associated with a rival gang, that would be sufficient to cause him to attack on sight.

Based on Ramon's tattoos; the clothing he was wearing at the time of the shooting; his contact, via text, with someone known to Aguilera to be a Norteño member from the Varrio North Side Madera subset; and the fact Ramon was housed in jail in the general population and it included Norteño gang members, Aguilera opined Ramon was a Norteño associate.  Aguilera researched David, Moreno, Christian, and Julio, and concluded they were not gang members.  Moreno was wearing red shorts at the time of the shooting, however, and a Sureño might have identified him as being a Norteño.  The same was true of Ramon's San Francisco Giants sweatshirt.  Norteños tend to use "San Francisco" as a logo, because to them it stands for "scrap free."

According to Aguilera, when Sureños perpetrated drive-by shootings in 2013, there usually were at least three individuals in the vehicle:  the driver, the shooter, and the lookout.  Every person in the car had a responsibility during the course of the shooting.  None of the vehicle's occupants were non-Sureño gang members, because they could not be trusted to back up the person doing something and to not talk to law enforcement.  In Aguilera's training and experience, it was common for gang members to yell out gang

11.

slurs during an assault, so that the victim and those in the general area knew who was responsible, thus increasing the gang's reputation.

In response to a hypothetical question based on evidence presented with respect to the events of March 21, Aguilera opined the shooting benefited the criminal street gang of the known gang member in the car. The shooting would boost the reputation of that gang member within the gang, and also boost the reputation of the gang. This in turn would be good for recruitment purposes. In addition, it would instill fear in the community, members of which would be less likely to cooperate with law enforcement due to fear of the case. It would also remove competition from rival gangs, allowing the gang that was responsible to conduct its gang business, and it would take over disputed gang territory, thereby making more areas in which the gang could conduct its business. For the same reasons, Aguilera further opined the conduct would be done with the specific intent to promote, further, or assist in felonious conduct by gang members.

### *Evidence Related to Events of March 29 (Counts 3-5)*

As of March 29, Jairo I., who had no gang affiliation, lived in the 200 block of Cypress, Madera. At approximately 3:14 that morning, he and his brother-in-law, G.A., who likewise had no gang affiliation, drove around to look for K., who had left the house on foot after she and G.A. got into an argument. They found her on Oak, between Pine Street and Cypress.

As G.A. got out of the car to talk to K., Jairo noticed a brownish-silverish Honda-looking car coming their direction. The car first went away from them, then came back toward them and parked behind them, blocking G.A.'s car. The brownish car had a missing hubcap and a dent just in front of the gas cap door. A person wearing a blue flannel shirt jumped out of the driver's side backseat, pointed a gun at G.A., and asked, "Do you bang?" When G.A. said no, the person got back into the car behind the driver and the car left.

12.

Jairo told G.A. and K. to get in G.A.'s car. They drove around the corner to Jairo's home, parked the car, and started walking toward the house. As they were crossing the street, the brownish car came around. This time, its headlights were off. Jairo, G.A., and K. ran for the house. The car passed them, then the person wearing the flannel shirt got out of the driver's side backseat and fired a shot. The bullet shattered the windshield and back window of the pickup truck behind which Jairo had taken cover. It then lodged in K.'s car.

Officer Valdez was dispatched to the scene. Jairo told him that the shooter made a statement as Jairo was running, but Jairo could not hear what was said. Valdez collected an expended shell casing and the bullet lodged in K.'s vehicle.

At approximately 4:00 a.m., Corporal Bushey saw a car matching the description of the suspect vehicle, in the area of Lake Street and Fourth Street. After following the vehicle for a while, Bushey initiated a felony vehicle stop. The car had three occupants: defendant, Manuel Mata (the vehicle's registered owner), and Angel Cortes. Defendant was the driver, Mata was the front seat passenger, and Cortes was in the backseat.[10] None had any weapons on his person, and no weapons were found in the vehicle. The location of the vehicle stop was about a mile and a half from the scene of the shooting.

Bushey directed Officer Alva, who had a canine partner, Axel, to have her dog do an article search where Bushey had made a U-turn to follow the vehicle and had briefly lost visual contact with it. Alva and Axel responded to the corner of Lake Street and Fourth Street, about six or seven blocks from the location of the vehicle stop and approximately two and a half miles from the scene of the shooting, and began

---

[10] Mata was wearing blue clothing and had tattoos that disrespected Northerners. Defendant was wearing blue underwear and had multiple tattoos signifying Playboy Sureños. Cortes was wearing blue on an item of clothing and had a tattoo signifying Vatos Locos Sureños. At trial, Jairo identified a photograph of Mata as the person who fired the gun.

13.

searching.[11]  Within about 30 seconds, Axel located a nine-millimeter Kel-Tec handgun on the sidewalk.  The gun was black, slightly scuffed on one side, and did not appear to have been there long.  It had nine rounds of Luger ammunition in the 10-round-capacity magazine and one round in the chamber.  Subsequent comparison showed the expended cartridge case found at the scene of the shooting was fired from this handgun.  The results of a comparison between the bullet extracted from K.'s vehicle and the handgun were inconclusive.

Jairo was taken to the scene, where he identified the vehicle stopped by Bushey as the one involved in the shooting.  He was shown the three occupants of the vehicle, and identified the one with the blue flannel shirt — Mata — as the shooter.  He was unable to identify defendant or Cortes as having been in the vehicle at the time of the shooting.[12]

Aguilera researched Jairo and Jairo's brother-in-law and concluded neither was a gang member.  In Aguilera's opinion, however, Mata was a Sureño gang member on the date of the shooting.  Aguilera based this opinion on police reports, evidence presented in Mata's most recent case, information from other officers, Mata's numerous gang-related tattoos, his association with known Sureño gang members, and the fact he was housed in the Sureño module while in jail.  Aguilera used to supervise Cortes and knew him to be a self-admitted member of the Vatos Locos Sureños subset.  In addition, Cortes had gang tattoos, was seen associating with numerous Sureño members, and was housed in the Sureño module while in jail.

---

[11] None of the locations were more than a few minutes apart by vehicle.

[12] When Jairo first saw the brownish car prior to the shooting, he could not see how many people were inside.  He never saw the driver.  He twice told Valdez that he saw two people in the car at the time of the shooting.  At no point did he say he saw three.  At trial, he testified that at first, he was unable to see how many people were in the car, but when they turned and came back around, he was able to see there were three.  He explained that he testified there were three people in the car, because when he got to where the car had been stopped, there were three individuals.

14.

The location where the shooting occurred was in an area claimed by the Varrio West Side Norteños subset of the Norteño criminal street gang. This was significant, because someone who was perceived to be a Norteño was targeted by Sureño gang members. In response to a hypothetical based on the prosecution's evidence, Aguilera opined the conduct was done for the benefit of a criminal street gang, would in fact benefit the gang, and was done with the specific intent to promote, further, or assist felonious conduct by gang members, for the same reasons he gave regarding the March 21 shooting. He also opined it was done in association with a criminal street gang, because there were multiple gang members acting together.

### *Evidence Related to Events of July 9 (Counts 6-14)*

On the morning of July 9, a search warrant was executed at a duplex in the 100 block of East 12th Street, Madera. Tina Rivas and Gonzalvo or Gonzalo Maciel lived there. The house was in an area claimed by the Sureño criminal street gang.

As police approached the house, Sergeant Foss heard a door in the back of the house open and slam shut, then what sounded like fences being jumped. Two blocks away and approximately 15 to 25 minutes later, Foss observed defendant walking down the street. Defendant was very sweaty and, despite the fact it was cold, was wearing shorts and a tank top and no shoes. When Detective Cederquist, who was driving, pulled up next to defendant, Foss asked where he was coming from. Defendant turned as if to head in the opposite direction and said something about coming from a friend's house. When Foss began to open the car door, defendant fled. After a short pursuit, defendant was taken into custody. There was a large splinter on his shirt that looked like it was from a wooden fence.

Meanwhile, law enforcement personnel forced entry into the home. Detective Keiser, who had authored the search warrant for purposes of an identity theft and fraud investigation involving Rivas, heard a door slam toward the back of the residence and footsteps, as if someone was running from the residence. Upon entry, Keiser saw the

15.

back kitchen door was partially open.  Rivas was in the hallway between the bathroom and bedroom one.  Maciel was in bedroom two.  Rivas's young children were in a third bedroom.  Felipe Barajas was hiding in a closet in bedroom two.  Loaded firearms and methamphetamine packaged for sale were found in two of the bedrooms.  There was also gang graffiti throughout the residence, including on stuffed animals.  Some of the graffiti specified Vatos Locos Sureño, and some specified Playboy Sureños.  Aguilera explained it was common to see various subsets sharing graffiti on items.  It showed they were united.

A cell phone found in bedroom two appeared to belong to defendant, based on its contents, which included videos of defendant having sex.  The video showed a Playboy bunny tattoo on defendant's penis.  There were also pictures that appeared to have been taken inside the residence.  A second cell phone, found in bedroom one, appeared to belong to Rivas or Maciel.  The phone contained images of defendant inside the home.  An entry on the phone's calendar, dated August 17, was titled "busta' hunting."  The attendee listed was "Cholo Maciel," with an e-mail address of "VLS13@gmail.com."  Another entry on the phone's calendar, dated July 7, was titled "Die busta', die" or "Die, buster, die."  It listed the same attendee and e-mail address.[13]

Rivas's oldest daughter told Keiser that defendant had been living in the residence, and he and Barajas had been paying rent for bedroom two.  They stopped paying, so defendant was not living there fulltime anymore, but was coming and going and staying for a few days at a time.  The girl also related that defendant recently had been shot; had an ex-girlfriend who was friends with Norteño gang members; and had brought the guns

---

[13] Aguilera explained that "busta" or "buster" is a derogatory term for Norteños that is used by Sureños.  "[B]uster hunting" means they are out looking for their rivals and trying to shoot them.  The pictures on the phones showed defendant throwing gang signs, wearing blue clothing, and showing his gang-related tattoos.  It could not be determined who took the photographs or when.

16.

to the house for protection, as they were all Southerners and were fearful due to defendant being shot.

Rivas was a self-admitted member of the Santa Paula Party Boys subset of the Sureño criminal street gang. Maciel was a self-admitted member of the Vatos Locos Sureños subset of Sureños. Based on Barajas's associations and jail documentation, Aguilera opined Barajas was also a Sureño member.

Aguilera explained that a stash house is a house to which gang members have easy access, and at which they often store weapons and drugs. Nongang members are not allowed in stash houses. In response to a hypothetical question based on the prosecution's evidence, he opined the residence on East 12th Street was a stash house, and all four gang members shared possession of the firearms found inside. He further opined possession of the loaded weapons benefited the gang by making weapons available for protection of the gang's turf and to commit new crimes for the gang. The conduct was also done in association with the gang, because four gang members were in possession of the guns. For the same reasons, Aguilera further opined the conduct was done with the specific intent to promote, further, or assist felonious conduct by gang members.

### *Evidence Related to Events of July 28 (Counts 15 & 16)*

On the morning of July 28, a fight broke out in Module H of the jail. This was the unit housing Southerners. Multiple inmates assaulted Inmate Juarez. Surveillance video showed defendant threw a cup of something at Juarez's face.[14] Inmate Jose Venegas then punched Juarez, whereupon defendant and other inmates also began punching, kicking, and stomping Juarez. When Juarez crawled to the door to try to get away, defendant grabbed him by the legs and dragged him back into the room.

---

[14] The video was played for the jury.

Based on Aguilera's training and experience, a non-Sureño or Sureño dropout could not be housed in the Sureño module, because such a person would be assaulted. Venegas was a self-admitted member of the Varrio Central Gangsters subset of the Sureño criminal street gang. Another inmate who appeared to have a leading role in instigating the fight was a self-admitted member of the Pocos Pero Locos subset of the Sureños. In Aguilera's opinion, based on numerous contacts with Juarez and having interviewed him right after the incident, Juarez was a Sureño member in June. As of July, however, he wanted to leave the gang and was no longer a member.

In response to a hypothetical question based on the prosecution's evidence, Aguilera opined that the conduct was done in association with a criminal street gang, as multiple gang members assisted in the assault. He further opined the conduct was done with the specific intent to promote, further, and assist in felonious conduct by gang members, and that it was done for the benefit of the gang. Although it was possible for one gang member to have a dispute with another gang member that was personal and completely unrelated to the gang, Aguilera did not believe that was the situation here, because multiple gang members participated in the assault.

### *Evidence Related to Events of August 2 (Counts 17-19)*

On the morning of August 2, Correctional Corporal Humbert was preparing to transfer jail inmates to court when defendant, who was in a cell, demanded to know why Humbert had had Officer Rivera close the pass door (tray slot). When Humbert denied having Rivera close the door, defendant told him to take off his badge, and that defendant would "F[uck Humbert] up." Humbert advised a classification officer of the incident and that it probably would be in the facility's best interest to move defendant to Module E, which housed the administrative segregation inmates.

Upon defendant's return from court, Humbert, Correctional Officer Hensel, and Corporal Lawrence unshackled defendant. Humbert directed him to dress out in new

18.

clothing, because he was going to be rehoused.[15] Defendant told the officers they could have warned him that he was going to be rehoused in Module E. It was explained to him that he was being reclassified and rehoused due to the incident earlier that morning. Defendant's shackles were removed, whereupon defendant became very upset and told the officers to "get the fuck out of the cell" so he could change. Lawrence stepped out, then Humbert followed. As Hensel was stepping out, defendant punched him with a fist on the left side of the head.[16] Hensel grayed out a bit and fell back into the sink, then he and defendant started having a fist fight. Defendant continued to fight and resist the officers' attempts to take him to the ground. It took the efforts of several additional officers, and Humbert striking defendant in the thigh with his baton, before defendant could be restrained.

Defendant was placed in an intake cell, where he yelled through the door, "I'm going to 'F' you up, Humbert. You're next" or, "Humbert, you're a bitch and you're next." Defendant's conduct deterred and delayed Humbert, Hensel, and Lawrence in doing the duties they were supposed to be doing at the time.

According to Aguilera, it is difficult for a gang member to conduct gang business if he is moved to the maximum security unit, because he will not have constant communication with other gang members in the facility. If a gang member perceives he has been disrespected, he needs to act — most often violently toward the person who disrespected him — or he will be deemed weak by his own gang and may even be physically assaulted for not acting. Assault on an officer by a gang member benefits the gang, because it gives the gang a reputation for being violent.

---

[15] Module H inmates wore yellow clothing. Administrative segregation inmates wore black-and-white striped clothing.

[16] Hensel suffered a laceration on one finger and the back of his arm, as well as a contusion above his left temple. He suffered headaches and joint pain in his jaw for days afterward.

19.

In response to a hypothetical question based on the prosecution's evidence, Aguilera opined that the conduct would benefit the gang member/inmate by intimidating staff. It would also benefit the gang by boosting its reputation for violence. Aguilera further opined the conduct was done with the specific intent to promote, further, or assist in criminal conduct by gang members, because it would boost the gang's reputation, and gangs thrive on fear and intimidation.

### Other Crimes and Miscellaneous Evidence

On the night of January 15, 2010, Fresno Police Officer Freeman was dispatched to a call of a loud party with a physical disturbance in progress. As he and his partner contacted the partygoers in the apartment, defendant and another man tried to enter the apartment. Defendant appeared to be intoxicated. Defendant and the other man disobeyed instructions to sit down, then defendant fled on foot. When Freeman caught up with him, defendant elbowed Freeman and knocked him into a planter box, injuring Freeman's shoulder. Freeman again gave chase and eventually had to deploy his Taser in order to take defendant into custody. Defendant said he was going to kill Freeman when he got out of jail, and he yelled, "South side for life." He also yelled a number of obscenities at the arresting officers.

On February 26, 2012, M.G. resided in the area of Road 29 and Avenue 13-1/2 in Madera. That afternoon, he was inside the house while his cousins were on the front lawn. Neither M.G. nor his cousins were gang members; however, M.G. was wearing a red Fresno State sweater, while one of his cousins, J.O., was wearing a red soccer jersey. Two or three individuals got out of a blue Honda. One, whose face was partially covered with a black bandana, pointed a black revolver at M.G.'s cousins and shouted, asking if they "banged." J.O. said no, that they were soccer players. The three stood there a short time, then got back in their car and left. As they left, the driver of the car yelled, "Chapeta."

20.

M.G. called the police. Within a minute or two of the call, Lieutenant Majeski saw a car fitting the description. There were three people inside. Majeski conducted an enforcement investigative stop on the vehicle. The driver was Abimael Castillo. The passenger in the front seat — defendant — had a black and white bandana in his hands. He disobeyed orders to keep his hands up, and instead kept dropping his right hand to the handle of the passenger door. Once defendant was out of the car, a .22-caliber silver revolver was found right below the door, outside of the vehicle, as if it fell out when defendant opened the car door.

The victims of the brandishing were transported to the location. All identified defendant, by his clothing but not his face, as the person with the gun. They also identified the blue Honda as the vehicle that was involved. Two of them identified Jose Venegas, who had been in the backseat of the Honda when it was stopped, as the driver.

The parties stipulated that defendant was convicted of being a felon in possession of a firearm, a felony, as a result of his conduct on February 26, 2012. According to Aguilera, Castillo and Venegas both were active Sureño gang members. Aguilera, who had been Castillo's probation officer, knew Castillo to drive an older, rounder-model, light blue, four-door Honda Accord. This was the vehicle in which defendant, Castillo, and Venegas were stopped in.[17]

Early on the morning of May 17, 2013, A.L. gave a friend a ride to buy groceries. Upon returning, she made a U-turn by pulling partway into the driveway of a house in the 100 block of East 12th Street.[18] She then pulled back out and parked in front of her friend's house.

---

[17] Castillo was in jail on March 21. Based on Blehm's investigation of various gang crimes throughout his career, he opined it was common for gang members to share cars and guns among themselves.

[18] This was the same address at which the search warrant was executed on July 9.

A.L. saw two males coming toward her from the house across the street, the driveway of which she had used to make her U-turn. One had a black hoodie tied around his head. He had a gun out. The other was pulling a gun from his waistband. He had on a loose hoodie and something black, like a surgical mask or folded bandana, covering most of his face. The one with the loose hoodie walked up close to her car, pointed the gun at her, and asked, "What's up, Ena?" A.L. previously had dated a Norteño and knew the phrase meant the person assumed she was a gang member. She told the person, who had "Madera" tattooed around his neck, that she did not bang.[19] She then jumped in her car and left. When she got home, she reported the incident to police. She subsequently saw an article in the Madera Tribune with defendant's photograph. She called the police back and told them he was the person who pointed the gun at her, and that he often was at the East 12th Street residence. She identified defendant at trial as the person who called her "Ena."

Aguilera explained that A.L. was in an area that was a stronghold for Sureño criminal street gang members. They perceived her to be a Norteño gang member, as demonstrated by use of the term "Ene." Gangs will not permit rival gang members to be in their gang turf.

On August 2, a search was conducted of the cell in Module H that defendant shared with one other inmate. An item of gang graffiti bearing the moniker "L-Nutty" was found on defendant's bed, as were rap lyrics titled "Who we are" that contained gang references (including to "murderous habbits" [sic]) and "L-Nutty." The lyrics were written on the back of court documents bearing defendant's name. Rap lyrics titled "Provoction" [sic] were found in a search of defendant's one-man cell on May 2, 2014.

---

[19] According to Aguilera, defendant had "Madera" tattooed on his neck.

22.

## II

### DEFENSE EVIDENCE

Michael Alvarez was a retired correctional sergeant with the Department of Corrections and Rehabilitation (CDCR), formerly California Department of Corrections, who specialized in prison and gang investigations and who was now a correctional consultant. He had 25 years of experience with CDCR. On many occasions, he had seen inmates who had written a name or moniker on something they wished to possess. In his training concerning gangs, he had never seen the term "got dibs" used to mean anything specific, such as claiming responsibility for a crime. In his opinion, the person who wrote "L-Nutty got dibs" on the newspaper wanted to reserve the right to that newspaper article.

Cederquist was part of the team that served the search warrant on July 9. He heard a commotion toward the backyard before the door was breached. After everything was secured, he and Foss drove around the area, as they felt someone had left through the backyard. When Cederquist saw defendant, it struck him as odd that defendant was not wearing shoes, since it was early in the morning. There was a park in the area to which people sometimes went to use drugs. Cederquist did not know if defendant was coming from the park.

### DISCUSSION

## I

### CONSOLIDATION/DENIAL OF SEVERANCE

As previously noted, defendant was charged in five separate Madera Superior Court cases that were consolidated for trial under case No. MCR046874.[20] He now

---

[20] Counts 1 and 2 originally composed case No. MCR046874. Counts 3 through 5 originally composed case No. MCR045882C. Counts 6 through 14 originally composed case No. MCR046672A. Counts 15 and 16 originally composed case No. MCR047229A. Counts 17 through 19 originally composed case No. MCR048535.

contends the trial court abused its discretion by consolidating the cases and then refusing to sever the murder and attempted murder cases for separate trials. He says the refusal to sever denied him his federal constitutional right to a fair trial on counts 1 through 5. We find no error and no denial of a fair trial.

## A.     Background

The People originally moved to consolidate defendant's murder, attempted murder, firearm possession, and inmate assault cases. They subsequently added the correctional officer assault case to their consolidation request. They asserted joinder was permitted by section 954 because the charges were connected together in their commission and/or were of the same class of crimes. They further asserted no substantial prejudice to defendant would flow from consolidation, because the evidence would be cross-admissible in separate trials to show motive, intent and knowledge, particularly with regard to the intent to benefit a criminal street gang and knowledge of the gang's criminal activity; the jury was not likely to be inflamed; the cases had the same strengths and weaknesses and so any spillover effect would not alter the outcome; and consolidation would not turn the matter into a capital case. Thus, they concluded, any prejudice to defendant created by consolidation would be substantially outweighed by the benefits of a single trial.

Defendant opposed the motion. He argued the cases were not connected together in their commission, so there would be no duplicative evidence other than the gang expert testimony. He argued the evidence would not be cross-admissible except with respect to the gang allegations; however, this was insufficient to overcome the prejudicial effect of joinder. Defendant claimed the charges were unusually likely to inflame the jury against him, in addition to which, the murder and attempted murder cases were much weaker than the others, so that consolidation would permit the People to combine multiple weak cases to achieve one strong case.

24.

After argument, the trial court ruled: "With respect to Mr. Novela's cases, all of these with the exception of the . . . case . . . in the house with the search warrant, all of them involved crimes of violence. In the case with the search warrant, . . . the charges involve firearms which two of the others also involve. [¶] . . . [I]f [the fingerprint] was all there was, it would be a weak case. But I think the evidence that I heard at the preliminary hearing makes it a much stronger case because of . . . basically the writings of Mr. Novela from his jail cell. I think the motive for the assault on the officers . . . that the [district attorney] will show is the fact that the defendant was charged with the 187 and was being moved. So I think all that's going to come in. And for those reasons, I am going to grant the motion of the People to consolidate all the cases."[21]

Defendant subsequently moved, in limine, for severance. He reiterated, virtually verbatim, his earlier opposition to consolidation, and asserted consolidation amounted to impermissible bootstrapping and was prejudicial to his case. At the hearing on the motion, he asserted the People were seeking to join two weak cases with three stronger but less serious cases, creating an atmosphere in which the jury would not look individually at the evidence from each case. He also argued the only commonality was the fact there were gang enhancements involved, making consolidation prejudicial.

The court ruled:

"With respect to the murder, attempted murder case, the assault of the inmate in the jail, and the assault of the correctional officers, . . . they are all crimes against a person, and in addition, the . . . murder case . . . and the attempted murder case both involved the discharge of firearms, they both involve vehicles. The Court finds there is cross admissibility in those two cases in particular because the Court would allow evidence of the [nine-millimeter] gun and [nine-millimeter] bullets that were found in the attempted murder case and introduced in the murder case. The Court finds that will be relevant.

---

[21] Defendant challenged the court's ruling by a petition for writ of mandamus/prohibition. We summarily denied the petition. (*Ciummo & Associates v. Superior Court* (Aug. 1, 2014) F069599.)

25.

"In all of those cases, in addition there's a special allegation pursuant to section 186.22 subdivision (b) and the Court finds that the evidence as to that allegation is cross admissible, as well.

"With respect to the search warrant case where drugs and guns were found, . . . it is similar, that firearms were found, and that firearms were alleged to have been used in the two other cases. However, there's also a special allegation pursuant to section 186.22 subdivision (b) and the Court finds cross admissibility as to that evidence.

"The Court, in addition, . . . that going to the testimony that the defendant was a victim not in custody made a statement that possesses weapons to protect himself from Norteños, and the Court finds that statement would be cross admissible as to all cases as to motive, and the Court finds that for those reasons, and it's [*sic*] discretion, that it's going to continue to allow the cases to be consolidated."

**B.  Analysis**

Section 954 governs both joinder and severance. (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.) It provides, in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. . . . [P]rovided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

" 'Offenses of the same class are offenses which possess common characteristics or attributes.' [Citations.]" (*People v. Landry* (2016) 2 Cal.5th 52, 76.) All assaultive crimes against the person are considered to be of the same class. (*People v. Walker* (1988) 47 Cal.3d 605, 622.) Offenses are connected together in their commission when they share a common element of substantial importance, even though they do not relate to the same transaction and were committed at different times and places against different victims. (*People v. Landry*, *supra*, 2 Cal.5th at p. 76; *People v. Leney* (1989) 213

Cal.App.3d 265, 269.) "[T]he intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission.' [Citation.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219.)

Joinder of the offenses with which defendant was charged in all five cases was statutorily permissible, because all were of the same class, connected together in their commission, or both. (See *People v. Landry*, *supra*, 2 Cal.5th at pp. 76-77.) Defendant does not appear to dispute this, but rather contends the murder and attempted murder cases should have been tried separately from the other three cases and from each other.

"We review the denial of severance under a deferential abuse of discretion standard. [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1128, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "To demonstrate that a denial of severance was reversible error, defendant must ' "clearly establish that there [was] a substantial danger of prejudice requiring that the charges be separately tried." ' [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 127.) "Refusal to sever may be an abuse of discretion where (1) evidence of the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 282.)

"In assessing whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling. [Citation.]" (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.) Denial of a severance motion amounts to an abuse of discretion only if the ruling "exceeds the bounds of reason, all of the circumstances being

27.

considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72; accord, *People v. Soper* (2009) 45 Cal.4th 759, 774.) "A pretrial ruling denying severance that is not an abuse of discretion can be reversed on appeal only if joinder is so grossly unfair as to deny the defendant due process. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 581.) "Even if the court abused its discretion in refusing to sever, reversal is unwarranted unless, to a reasonable probability, defendant would have received a more favorable result in a separate trial. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 575.)

We first consider the issue of cross-admissibility. "If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.]" (*People v. Soper*, *supra*, 45 Cal.4th at pp. 774-775; accord, *Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1221; *People v. Jenkins* (2000) 22 Cal.4th 900, 948.) " '[T]he issue of cross-admissibility "is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence" that tends to prove a disputed fact. [Citations.]' [Citation.] Thus, . . . ' "complete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A' — even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' " ' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 849, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

"Whether the evidence of other crimes would have been admissible in separate trials on the others is governed by Evidence Code section 1101, subdivision (b), which permits admission of other uncharged acts when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." (*People v. Lucas* (2014) 60 Cal.4th 153, 214-215, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, fn. 19.) "In order to be admissible to prove intent, the uncharged misconduct must

28.

be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 403.) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Ibid.*) Similarity of offenses is not required to establish the motive theory of relevance. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1115.)

The gang evidence — both in general and as it specifically related to each case — would have been cross-admissible in all five cases to show motive, intent, and knowledge, and, as between the murder and attempted murder cases, common scheme or plan ("buster hunting"). The gang evidence, the car defendant was driving following the attempted murder, and the gun and ammunition found in connection with the attempted murder case also would have been cross-admissible, as between the murder and attempted murder cases, for other permissible purposes. (See, e.g., *People v. Thompson*, *supra*, 1 Cal.5th at pp. 1114-1115; *People v. Jackson* (2016) 1 Cal.5th 269, 303; *People v. Valdez* (2012) 55 Cal.4th 82, 130-131; *People v. Carter* (2003) 30 Cal.4th 1166, 1194-1195.)[22]

---

[22] With respect to the handgun that was recovered in connection with the attempted murder case, it possibly was the same caliber as the weapon used in the murder case. Accordingly, it was relevant to that case. (See *People v. Mills* (2010) 48 Cal.4th 158, 197.) With respect to the guns recovered during the search of the 12th Street residence, there was no evidence connecting them to any case but the firearms possession matter. Nevertheless, they were not automatically inadmissible, as merely showing only

We recognize that in *Williams v. Superior Court* (1984) 36 Cal.3d 441, the California Supreme Court found prejudicial joinder, and no cross-admissibility of evidence between two shooting incidents. There, the only theory of cross-admissibility was that evidence relating to one shooting would be probative of the identity of the killer in the other case, and the two incidents had virtually nothing in common except for the infer ence both may have been gang related. (*Id*. at pp. 449-450.) The state high court noted the evidence of gang membership might well have a prejudicial — even inflammatory — effect on the jury in a joint trial, "lead[ing] a jury to cumulate the evidence and conclude that [the defendant] must have participated in some way in the murders or, alternatively, that involvement in one shooting necessarily implies involvement in the other." (*Id*. at p. 453.) In the present case, in contrast, the trial court had before it other theories of relevancy that did not require the commonality of features necessary to show identity. Moreover, *Williams* is not dispositive with respect to the prejudicial effect of gang-related evidence, as it was decided prior to enactment of the California Street Terrorism Enforcement and Prevention (STEP) Act (§ 186.20 et seq., added by Stats. 1988, ch. 1242, § 1, eff. Sept. 23, 1988), of which section 186.22 is part. (See *People v. McKinnon*, *supra*, 52 Cal.4th at pp. 655-656 [gang evidence properly admitted to show motive; although, even where relevant, gang evidence may have highly inflammatory impact on jury, probative value of motive generally exceeds prejudicial effect].)

---

that defendant was the sort of person who possesses firearms, in all but that case. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1056.) Rather, under the circumstances of at least the murder and attempted murder cases, "that defendant possessed numerous firearms had 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' (Evid. Code, § 210), namely, that he was a gang member at war with a rival gang. [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1073.)

Even if the evidence underlying the various charges would not be cross-admissible in hypothetical separate trials, "that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges. [Citation.]" (*People v. Soper*, *supra*, 45 Cal.4th at p. 775; accord, *Alcala v. Superior Court*, *supra*, 43 Cal.4th at pp. 1221-1222 & cases cited; see § 954.1.)[23]  This is because none of the other two factors relevant to the severance issue demonstrates the trial court abused its discretion.[24]

First, none of the charges were especially likely to inflame the jury against defendant.  Indeed, the murder and attempted murder were more inflammatory than the remaining three sets of charges, because of the random, unprovoked nature of the two shootings.  Neither shooting, however, was more likely than the other to inflame the jury's passions.  (See *People v. McKinnon*, *supra*, 52 Cal.4th at p. 631; see also *People v. Capistrano*, *supra*, 59 Cal.4th at p. 850; cf. *People v. Earle* (2009) 172 Cal.App.4th 372, 400-401.)

Second, although there are differences in the strength of the evidence as between the murder and attempted murder cases on the one hand, and the firearms possession and in-custody cases on the other, those differences are not so great that the spillover effect of the aggregate evidence might alter the outcome of any of the charges.  As the California Supreme Court has stated:  "[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other.  A mere

---

[23] Section 954.1 provides:  "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact."

[24] The third factor aside from cross-admissibility — whether one of the charges carries the death penalty or joinder turns the matter into a capital case — is not applicable here.

imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges. [Citation.] Furthermore, the benefits of joinder are not outweighed — and severance is not required — merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried. [Citations.]" (*People v. Soper*, *supra*, 45 Cal.4th at p. 781.)

Here, the prosecution's case against defendant with respect to the two shooting incidents was comparatively weaker than that with respect to the remaining charges. For instance, it could not be determined when defendant placed his fingerprint on the beer bottle found at the scene of the homicide, nor did the fact defendant was driving the car used in the attempted murder some 45 minutes after that shooting, necessarily establish defendant was also driving it at the time of that crime. (See *People v. Sanford* (2017) 11 Cal.App.5th 84, 85, 92-94.) We do not believe, however, that the disparity was so great "that the stronger counts would fill in the gaps in the evidence for the weaker counts." (*People v. Jones* (2013) 57 Cal.4th 899, 927; see *People v. Hill* (1995) 34 Cal.App.4th 727, 735-736.) "In order to demonstrate the potential for a prejudicial spillover effect, defendant must show an 'extreme disparity' in the strength or inflammatory character of the evidence. [Citation.]" (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1436.) The danger to be avoided — " 'that strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime" (*People v. Mason* (1991) 52 Cal.3d 909, 934) — is not present here. Any imbalance in the strength of the evidence does not indicate a risk of prejudicial spillover effect, particularly since the evidence related to the three assertedly stronger cases and the evidence related to the murder and attempted murder cases "were sufficiently distinct 'as to render the likelihood of

32.

prejudice minimal.' [Citation.]" (*People v. Ybarra*, *supra*, 245 Cal.App.4th at p. 1438.)[25]

The burden is on defendant to persuade us that the benefits of joinder, discussed at length in *People v. Soper*, *supra*, 45 Cal.4th at pages 781 through 782, were outweighed by a substantial danger of undue prejudice (*People v. Sandoval* (1992) 4 Cal.4th 155, 173, affd. *sub nom. Victor v. Nebraska* (1994) 511 U.S. 1). He has not met this burden, and so it follows the trial court did not abuse its discretion in consolidating the five cases and refusing to sever the murder and attempted murder cases from the other three and from each other. (See *People v. Price* (1991) 1 Cal.4th 324, 390.)

" '[E]ven if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts . . . for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]' " (*People v. Soper*, *supra*, 45 Cal.4th at p. 783.) We find no violation of defendant's right to due process and a fair trial. Much of the gang evidence, including the writings found in defendant's jail cells, would have been admitted even if all five cases had been tried separately. It is highly likely the evidence concerning the uncharged offenses that occurred on February 26, 2012, and May 17, 2013, would have been admitted had the attempted murder (and possibly the murder) case been tried separately. The evidence underlying the nonshooting charges was relatively straightforward and distinct from the evidence underlying the shooting charges, and was not unduly inflammatory. (Compare *People v. Soper*, *supra*, 45 Cal.4th at p. 784 with *People v. Grant* (2003) 113 Cal.App.4th 579, 588.) The jury returned "**NOT TRUE**" findings on the gang enhancements appended to the charges involving the correctional officers. This demonstrates jurors were capable of, and did, differentiate among the various charges,

---

[25] To the extent the evidence was not distinct, as in, for example, the writings found in searches of defendant's jail cells, "any spillover effect would [be] entirely proper." (*People v. Ruiz* (1988) 44 Cal.3d 589, 607.)

allegations, and evidence.  (See *People v. Jones*, *supra*, 57 Cal.4th at p. 927.)  It also demonstrates jurors did not impermissibly cumulate evidence or assume, because of the gang evidence or evidence on certain charges, that because defendant was guilty of one charge, he was guilty of all.[26]

## II

### ADMISSION OF CELL PHONE CALENDAR ENTRIES

Defendant contends the trial court erred by not excluding, pursuant to Evidence Code section 352, the calendar entries in the cell phone belonging to Rivas or Maciel that referenced "busta' hunting" and "Die, buster, die."  Defendant says the error violated his federal constitutional right to a fair trial and was prejudicial with respect to counts 1 through 5, despite a limiting instruction.  We conclude any error was harmless.

### A.    Background

The discovery of the cell phone in the East 12th Street residence and the calendar entries in issue are described in the statement of facts, *ante*.[27]  The People moved, in limine, to admit those entries on the grounds the evidence was relevant to show Maciel was an active participant in the Sureño criminal street gang, as the People had to prove two gang members were actively involved for defendant to be convicted of violating section 186.22, subdivision (a); the firearms found in the residence were possessed to benefit the Sureño criminal street gang; and members of the Sureño criminal street gang hunt Norteño gang members with the specific intent to kill, which in turn showed premeditation and deliberation.  Defense counsel argued the statements were irrelevant, not connected to defendant, and more prejudicial than probative.  When the court stated it

---

[26] Because the Attorney General has not claimed, and we have not found, forfeiture, we need not reach defendant's claim that if any issue raised with respect to consolidation/severance was forfeited due to defense counsel's omission, counsel rendered ineffective assistance.

[27] Although it was never established whether the cell phone belonged to Rivas or to Maciel, we will refer to it as Maciel's phone, since the calendar entries referred to him.

would need more evidence to permit the argument that "die buster die" was something defendant had adopted, the prosecutor agreed, and proffered the evidence to establish Maciel was an active Sureño gang member. The court stated it would consider giving a limiting instruction unless the prosecutor could tie defendant to the calendar entries.

At trial, Cederquist testified to the cell phone calendar entries and their content. Aguilera subsequently explained that "busta" is a derogatory term used by Sureño criminal street gang members to refer to Norteños. He continued: "So buster hunting pretty much means that they're out looking for their rivals and trying to shoot these individuals." When defense counsel objected, citing the in limine motion, a bench conference was held. The court then advised the jury: "Ladies and gentlemen, one thing that needs to be cleared up is that statement as to busta hunting is in no way attributable to Mr. Novela. It's all agreed that the evidence in that would be attributed to Mr.Gonzalo Maciel and not Mr. Novela, and that — so you cannot consider that in determining whether or not Mr. Novela committed any of the crimes for which he is charged." During the giving of jury instructions, jurors were told: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and no other."

## B.    Analysis

The admissibility of the calendar entries " 'has two components: (1) whether the challenged evidence satisfied the "relevancy" requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.' [Citation.]" (*People v. Heard* (2003) 31 Cal.4th 946, 972.) "Relevant evidence includes all 'evidence . . . having any tendency in reason to prove . . . any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) Under Evidence Code section 352, a trial court may

35.

exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome [citation]." ' [Citation.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 289-290.)

A trial court has broad discretion both in determining relevance and in assessing whether probative value is outweighed by the danger of prejudice, and we review a trial court's rulings on those subjects for abuse of that discretion. (*People v. Riggs*, *supra*, 44 Cal.4th at pp. 289-290; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, abrogated on another ground as stated in *People v. Leon* (2020) 8 Cal.5th 831, 848.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' " (*People v. Rodrigues*, *supra*, at pp. 1124-1125.) An abuse of discretion is not shown merely because there is an opportunity for a difference of opinion. (*People v. Goldman* (2014) 225 Cal.App.4th 950, 959.)

In reviewing the trial court's determinations, we view the evidence in the light most favorable to that court's ruling. (*People v. Edwards* (2013) 57 Cal.4th 658, 711.) With respect to a ruling under Evidence Code section 352, we must keep in mind that " '[t]he code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a[n Evidence Code] section 352 objection should fail. [Citation.]' " (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.)

In connection with the firearm- and ammunition-possession counts, defendant was charged with active participation in a criminal street gang, in violation of subdivision (a) of section 186.22. In order to establish this offense, the People were required to prove, inter alia, the felonious criminal conduct was committed by at least two gang members,

one of whom could be defendant.  (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132 (lead opn. of Corrigan, J.); see *id*. at p. 1139 (conc. opn. of Baxter, J.).)  The calendar entries had at least some tendency in reason to prove Maciel was the second requisite gang member.  To the extent Maciel's active participation, and not merely defendant's, had to be shown at or reasonably near the time of the crime (see *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509), the calendar entries also had at least some tendency in reason to prove that issue in a way Maciel's tattoos could not, since there was no evidence when he acquired those tattoos.

Defendant says other evidence overwhelmingly established Maciel was a Sureño gang member, plus Maciel was not the only Sureño in the residence where the guns were found; hence, the calendar entries were cumulative.  Evidence — even gang evidence — does not become irrelevant solely because it is cumulative of other evidence, because the prosecution has the ability to establish the disputed matters with other evidence, or because the defense chooses not to contest the point.  (*Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Valdez*, *supra*, 55 Cal.4th at p. 134; *People v. Smithey* (1999) 20 Cal.4th 936, 975.)  Even where relevant, however, "the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury.  [Citations.]"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224.)

We are not convinced the calendar entries were cumulative of other evidence, such that their probative value was reduced.  (See *People v. Valdez*, *supra*, 55 Cal.4th at p. 134; compare *People v. Ventura* (1991) 1 Cal.App.4th 1515, 1519 with *People v. Avitia* (2005) 127 Cal.App.4th 185, 193-194.)  Assuming they should have been excluded pursuant to Evidence Code section 352, however, we conclude the very direct limiting instruction given by the court obviated any potential harm.  (See *People v. Montes* (2014) 58 Cal.4th 809, 860; *People v. Gutierrez* (2009) 45 Cal.4th 789, 820; cf. *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)  " 'Any prejudice that the challenged

information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury.  We presume that jurors comprehend and accept the court's directions.  [Citation.]  We can, of course, do nothing else.  The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.'  [Citation.]"  (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.)

In light of the foregoing, assuming the trial court erred, defendant is not entitled to reversal, because it is not reasonably probable he would have achieved a more favorable result had evidence of the calendar entries been excluded.  (See *People v. Lenart* (2004) 32 Cal.4th 1107, 1125; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  Nor does defendant persuade us that admission of the evidence violated his federal constitutional right to due process, which would require us to determine whether the claimed error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  (See *People v. Lenart*, *supra*, at p. 1125.)

"To prove a deprivation of federal due process rights, [defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.  'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]"  (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 229; see *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384.)  As we have explained, the jury could have drawn from the calendar entries the permissible inference that defendant was committing crimes with another gang member.  Moreover, in light of the other, properly admitted gang evidence and the trial court's limiting instruction, the challenged evidence was not of such quality as necessarily prevented a fair trial.

Defendant says the challenged evidence constituted predisposition evidence against Maciel, which had the effect of tainting defendant because he allegedly resided with Maciel. The trial court's limiting instruction prevented any such effect.

Defendant says the prosecutor, in closing argument, "tied the notion of buster hunting to [defendant], which Maciel's calendar of events indicated was planned activity to kill, even after the murder and attempted murder in this case." It is true the prosecutor pointed to the incident of February 26, 2012, the two charged shooting incidents, and the incident involving A.L. and, over defense objection, told the jury defendant "was caught four times by law enforcement buster hunting between February of 2012 and March of 2013." She repeated the phrase when arguing the murder was a "joint operation" of every person in the car, and that defendant intended to kill. In doing so, however, the prosecutor referred not to the calendar entries on Maciel's cell phone, but to defendant's own rap lyrics. Accordingly, her argument did not undermine the effect of the limiting instruction. (See *People v. Ervine* (2009) 47 Cal.4th 745, 776; *People v. Bryden* (1998) 63 Cal.App.4th 159, 179.)

Finally, defendant contends that if the error was not individually prejudicial, it becomes so when viewed cumulatively with the asserted error in consolidating/failing to sever the various cases, *ante*. By simply including a paragraph asserting cumulative prejudice defendant's briefing violates California Rules of Court, rule 8.204(a)(1)(B), which requires that each brief state each point under a separate heading or subheading. In any event, since we found no error with respect to the consolidation/severance argument, there is no prejudice to cumulate.

### III

#### SUFFICIENCY OF THE EVIDENCE

Defendant contends his convictions on counts 6, 7, 11, and 12 must be reversed for insufficient evidence. Those counts charged him with possessing the firearms, and ammunition in the firearms, found in Maciel and Rivas's bedroom during the search of

the residence on East 12th Street. We conclude substantial evidence supports the convictions.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart*, *supra*, 32 Cal.4th at p. 1125.)

Defendant was convicted, in counts 6 and 7, of violating section 29800, subdivision (a)(1). That statute prohibits anyone who has been convicted of a felony from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearm. Defendant was convicted, in counts 11 and 12, of violating section 30305, subdivision (a)(1). That statute prohibits anyone who is prohibited from possessing a firearm under section 29800, from owning, possessing, or having under his

or her custody or control, any ammunition.  Counts 6 and 11 were based on a Smith and Wesson .22-caliber revolver that was loaded with six rounds.  Counts 7 and 12 were based on an M1 .30-caliber carbine rifle that was loaded with six rounds.

The elements of a violation of section 29800, subdivision (a)(1) "are conviction of a felony and ownership or knowing possession, custody, or control of a firearm. [Citations.]"  (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.)[28]  Each of these elements may be established by circumstantial evidence.  (*People v. Morales* (2001) 25 Cal.4th 34, 41.)

"Possession may be physical or constructive, and more than one person may possess the same contraband.  [Citation.]"  (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.)  A defendant has actual physical possession when the firearm is in his or her immediate possession or control.  (*People v. Blakely*, *supra*, 225 Cal.App.4th at p. 1052.) "Constructive possession exists where a defendant maintains some control or right to control contraband that is in the actual possession of another.  [Citation.]"  (*People v. Morante* (1999) 20 Cal.4th 403, 417.)  " 'Possession may be imputed when the contraband is found in a location which is immediately and exclusively accessible to the accused and subject to his dominion and control' [citation] or which is subject to the joint dominion and control of the accused and another [citations].  The accused also has constructive possession of [contraband] that [is] in the physical possession of his agent or of any other person when the defendant has an immediate right to exercise dominion and

---

[28] Section 29800, subdivision (a)(1) was formerly section 12021, subdivision (a). Section 30305, subdivision (a)(1) was formerly section 12316, subdivision (b)(1).  Since the statutes were continued, upon reorganization and renumbering, without substantive change (Cal. Law Revision Com. com., 51D pt. 4 West's Ann. Pen. Code (2012 ed.) foll. §§ 29800, p. 194 & 30305, p. 284), authorities analyzing the former statutes are equally applicable to the present laws.

As to each set of offenses, jurors here were instructed only on possession.  We tailor our analysis accordingly.  Because the parties stipulated defendant previously was convicted of a felony, we do not further discuss that element.

control over the [contraband].  [Citations.]"  (*People v. Francis* (1969) 71 Cal.2d 66, 71.)  When the contraband is located at premises other than those of the defendant, however, dominion and control may not be inferred solely from the fact of the defendant's presence, even if the evidence shows defendant knew of the contraband's presence.  (*People v. Jenkins* (1979) 91 Cal.App.3d 579, 584.)

The evidence presented at trial showed the loaded firearms in issue were located in bedroom one of the residence on East 12th Street.  It appeared Maciel and Rivas, who were in an intimate relationship, lived in that bedroom.  Photographs on the cell phone that belonged to Rivas or Maciel, which was also found in that bedroom, showed defendant holding one of the firearms found in bedroom two and another male holding what appeared to be one of the firearms found in bedroom one.  The photographs appeared to have been taken inside the residence.  The phone also contained a photograph of defendant and another male, each of whom was holding a rifle, with Rivas sitting in front of them.  The photograph appeared to have been taken in bedroom one.  A cell phone that appeared to belong to defendant was found in bedroom two.  A couple of pictures in the phone appeared to have been taken inside the residence.  Rivas's daughter told one of the detectives that defendant had been living in the residence.  He and Barajas had been paying rent for some time for bedroom two, but stopped paying.  As a result, defendant was not living there fulltime anymore, but was coming and going and staying there for a few days at a time.  The daughter said defendant recently had been shot, had an ex-girlfriend who was friends with Norteño gang members, and defendant brought the guns to the house as protection for the residence, all of whom were southerners and were fearful due to defendant being shot.  There was evidence from which it reasonably could be inferred defendant fled from the house as police arrived to serve the search warrant.

The residence was in Sureño territory.  In answer to a hypothetical question, Aguilera opined it was a stash house.  He explained that a stash house is a residence to which gang members have easy access.  Many times, they store weapons and drugs at

42.

such stash houses, because they need a general location where they can easily access a weapon when needed to commit crimes. Nongang members are not allowed into stash houses, which are protected with weapons.

Viewing the evidence according to the applicable legal principles, set out *ante*, we conclude it is sufficient to support defendant's convictions for possession of the weapons and ammunition found in bedroom one. Although the guns were not found in the bedroom he used when staying at the house, photographs were found of him in that bedroom. There was evidence from which it reasonably could be inferred he was at the house when police arrived. There was evidence the residence was a stash house, at which gang members stored and had easy access to weapons. Significantly, Rivas's daughter related that defendant had recently been shot and had brought the weapons to the house for purposes of protection. Although hearsay, this testimony was admitted without objection (indeed, it was elicited by defense counsel) or limitation. (Cf. *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1418, disapproved on another ground in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.) Accordingly, it " ' "[took] on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding." ' [Citations.]" (*People v. Panah* (2005) 35 Cal.4th 395, 476; accord, *People v. Baker* (2012) 204 Cal.App.4th 1234, 1245.)

" 'Implicitly, the crime is committed the instant the felon in any way has a firearm within his control.' [Citation.]" (*People v. Blakely*, *supra*, 225 Cal.App.4th at p. 1052.) Because the offense is not one as to which time is of the essence or a material ingredient, the proof of possession need not conform to the exact date alleged in the information. (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 130.) Here, the evidence was such that a rational juror could infer defendant brought the weapons to the house (and therefore had them in his direct physical control) near in time to the date alleged by the People; defendant was at the house, and so in close physical proximity to the loaded weapons, the day alleged; since it was defendant who brought the firearms to the house, he had the

right to exercise dominion and control over all of them, including those that were found in the bedroom in which Rivas and Maciel stayed; and, since defendant brought the weapons to the house for purposes of protection, he knew they were loaded.[29]

Substantial evidence supports the convictions on the challenged counts.

## IV

### THE ATTEMPTED MURDER CONVICTION (COUNT 3)

Defendant initially argued the finding of deliberation and premeditation on his attempted murder conviction (count 3) must be reversed, because the jury was permitted to rely on Manuel Mata's mental state for that finding under the natural and probable consequences doctrine. Following the state high court's first grant of review and transfer, he further argued the attempted murder conviction itself must be reversed pursuant to Senate Bill No. 1437. Following the state high court's second grant of review and transfer, defendant once again argues the attempted murder conviction must be reversed, now pursuant to Senate Bill No. 775. We agree with this latter claim and so conclude the two original claims, concerning the premeditation finding and the effect of Senate Bill No. 1437 are moot and need not be addressed.

A.     **Background**

As set out in the statement of facts, *ante*, Jairo identified Mata as the person who shot at him on March 29, 2013. The People sought to prove defendant was guilty of attempted murder based on theories of direct aiding and abetting; conspiracy to commit murder, assault with a firearm, or simple assault, with attempted murder as a natural and probable consequence thereof; and aiding and abetting assault with a firearm or simple assault, with attempted murder as a natural and probable consequence thereof.

---

[29] This evidence is quantitatively and qualitatively distinguishable from that which the appellate court found insufficient in *People v. Sifuentes*, *supra*, 195 Cal.App.4th at pages 1413 through 1419, on which defendant relies.

Jurors were told to consider the instructions together. Pursuant to CALCRIM No. 401, they were instructed on aiding and abetting intended crimes, i.e., direct aiding and abetting. Pursuant to CALCRIM No. 402, they were instructed on the natural and probable consequences doctrine with respect to an aider and abettor's liability. Pursuant to CALCRIM No. 417, they were instructed on the natural and probable consequences doctrine with respect to a coconspirator's liability. Pursuant to CALCRIM No. 601, jurors were told that if they found defendant guilty of attempted murder, they had to decide whether the People had proved the crime was done willfully and with deliberation and premeditation; and that the attempted murder was done willfully and with deliberation or premeditation if defendant and/or Mata acted with that state of mind.

In her summation, the prosecutor told jurors that with respect to attempted murder, defendant was guilty as a direct aider and abettor. She also argued, however, that defendant was guilty of the target crimes of conspiracy to commit murder, conspiracy to commit assault with a firearm, conspiracy to commit assault, aiding and abetting an assault with a firearm, and aiding and abetting assault. She asserted that attempted murder was a natural and probable consequence of each of those crimes; hence, defendant was guilty of attempted murder even if he did not have the intent to attempt to kill Jairo. With respect to whether the attempted murder was committed willfully, deliberately, and with premeditation, she stated: "When we're talking about the murder case, we are looking at the defendant himself. Only him. Okay? We're not looking at the shooter, whether the shooter acted willfully, deliberately or with premeditation, okay, just Mr. Novela. When we're talking about attempted murder, we are looking at either of them. We're looking at either Mr. Novela or Mr. Mata, okay? . . . [¶] . . . [W]ith attempted murder, the defendant — it will be true whether it's Mr. Novela who acted willfully, deliberately or premeditated, or if it's Mr. Mata."

45.

**B.     Applicable Law**

In order for a defendant to be convicted as an aider and abettor, the People must prove he or she acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.  [Citations.]  [¶]  When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. . . .  [A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.  [Citations.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

In addition, " ' "[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' " (*People v. Chiu* (2014) 59 Cal.4th 155, 161, abrogated on another ground by Sen. Bill No. 1437.)

> "A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable.  [Citation.]  The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.]  Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' [Citation.]  Reasonable foreseeability 'is a factual issue to be resolved by the jury.' [Citation.]" (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 161-162.)[30]

Thus, prior to the passage of Senate Bill No. 1437, our Supreme Court explained, " '[I]f a person aids and abets only an intended assault, but a murder results, that person may be

---

[30] The same principles apply where coconspirator liability is at issue.  (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.)

guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' " (*People v. Chiu*, *supra*, 59 Cal.4th at p. 161.)

Effective January 1, 2019, Senate Bill No. 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The legislation did so by amending sections 188 and 189. It also added section 1170.95, which provides a petition procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, §§ 2-4.)

The felony-murder rule is not at issue in defendant's case. With respect to the natural and probable consequences doctrine, Senate Bill No. 1437 added a provision to section 188 that states, in pertinent part: "[I]n order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Subsequently, Senate Bill No. 775 "[c]larifie[d] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1, subd. (a), p. 2.) Senate Bill No. 775 makes clear that a conviction for attempted murder may no longer be based on the natural and probable consequences doctrine. (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)

Senate Bill No. 775 also amended section 1170.95 to extend relief under the petition process to those "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the

natural and probable consequences doctrine, or manslaughter . . . ." (§ 1170.95, subd. (a).) As amended, section 1170.95 further provides that "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill [No.] 1437 . . . ." (§ 1170.95, subd. (g).)

**C.      Analysis**

The parties agree that Senate Bill No. 775 applies to defendant's conviction on count 3. (See *People v. Porter* (2022) 73 Cal.App.5th 644, 651-652.) However, they disagree as to the appropriate remedy. Defendant asks us to determine the validity of his conviction under the amended law, and to vacate the sentence and remand for further proceedings and/or resentencing. The Attorney General argues the matter should be remanded with directions for the trial court to determine whether defendant is entitled to relief under the amended law.

Senate Bill No. 775 makes it abundantly clear that a person convicted of attempted murder may challenge the validity of that conviction on direct appeal if the conviction is not yet final. (§ 1170.95, subd. (g).) Consequently, the validity of the conviction must be resolved on direct appeal. (See *People v. Birdsall* (Apr. 22, 2022, A159555) ___ Cal.App.5th ___ [2022 Cal.App. LEXIS *335, *10-*13] [evaluating validity of felony murder conviction on direct appeal].) As we explain, we agree with defendant that his conviction of attempted murder in count 3 must be reversed, and the matter remanded for further proceedings and/or resentencing.

The instructions given to defendant's jury permitted defendant to be convicted of attempted murder on a now invalid theory, without a finding he had the mental state of intent to kill. Accordingly, we turn to a prejudice analysis in defendant's case. "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required . . . unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory . . . ." (*People v. Chiu*,

48.

*supra*, 59 Cal.4th at p. 167; accord, *People v. Birdsall*, *supra*, ___ Cal.App.5th at p. ___ [2022 Cal.App. LEXIS *335, *15].) In other words, the *Chapman* test applies. "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.)

On the record before us, we cannot conclude, beyond a reasonable doubt that defendant's jury based its verdict on count 3 on the legally valid theory. Not only was the jury instructed on the natural and probable consequences theory with respect to the attempted murder charge, but the prosecutor argued that theory at length in her summation. Although the jury found true the allegation that the attempted murder "was committed willfully, deliberately and with premeditation," the instructions and prosecutorial argument on the point leave us unable to say, with any assurance, that the finding was based on defendant's own mental state, as opposed to that of Mata, the actual shooter. (See *People v. Aledamat*, *supra*, 8 Cal.5th at pp. 14-15.)

In light of the foregoing, we must reverse defendant's conviction for attempted murder. We will remand the matter for further proceedings on this count, as the People may choose to simply have the trial court resentence defendant on count 4,[31] as defendant requests, or they may choose to retry the charge under any currently valid theory of liability. (See *People v. Chiu*, *supra*, 59 Cal.4th at p. 168.)

## V

## ASSEMBLY BILL NO. 333

Defendant contends the prosecution failed to prove a "pattern of criminal gang activity," as defined under section 186.22, as amended by Assembly Bill No. 333. Accordingly, defendant seeks reversal of his convictions on counts 5, 14, and 16; the

---

[31] Count 4 was based on the same shooting as count 3. Sentence on count 4 was stayed pursuant to former section 654.

gang enhancements to counts 1 through 4, 6 through 13, and 15; and the firearm enhancements to counts 1 and 3. Additionally, as to the gang enhancement on count 15, defendant contends the prosecution failed to prove the assault benefited the gang in more than a reputational way. The Attorney General concedes error. The parties agree the appropriate remedy is reversal of the affected counts and enhancements, and remand to afford the prosecution an opportunity to retry the counts and enhancements to meet its burden of proof.

## A.    **Applicable Law**

Assembly Bill No. 333 amended the language of section 186.22 to modify the showing necessary to prove gang offenses and gang enhancements.[32] (Stats. 2021, ch. 669, § 3, eff. Jan. 1, 2022.)

First, Assembly Bill No. 333 amended the language of subdivision (f) of section 186.22. Formerly, subdivision (f) defined a "criminal street gang," in relevant part, as "any ongoing organization, association, or group of three or more persons . . . *whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity.*" (§ 186.22, former subd. (f); italics added.) Assembly Bill No. 333 amended this definition to include only "an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f); italics added.) Thus, to prove the existence of a criminal street gang, the prosecution must now prove the predicate offenses required to establish a "pattern of criminal gang activity" were committed by gang members collectively. It is no longer sufficient to prove that individual gang members

---

[32] Assembly Bill No. 333 also added section 1109, which requires bifurcation of the trial of gang enhancements and substantive gang offenses from that of the underlying offenses upon a defendant's request. (§ 1109, subds. (a), (b).) The Attorney General contends section 1109 is not retroactive. However, defendant raises no argument regarding the applicability of section 1109, and we therefore do not address this issue.

committed the predicate offenses.  (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344-345.)

Assembly Bill No. 333 also amended the language of subdivision (e) of section 186.22, which defines a "pattern of criminal gang activity."  Under the former law, a "pattern of criminal gang activity" was established by "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and *the offenses were committed on separate occasions, or by two or more persons*."  (§ 186.22, former subd. (e); italics added.)  However, Assembly Bill No. 333 redefines "pattern of criminal gang activity" to require "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense *and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational*."  (§ 186.22, subd. (e)(1), italics added.)  Furthermore, "[u]nder the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses."  (*People v. Ramos* (Apr. 27, 2022, F080916) ___Cal.App.5th ___ [2022 Cal.App. LEXIS *355, *15]; accord, § 186.22, subd. (e)(2).)

Additionally, Assembly Bill No. 333 added a new subdivision to section 186.22, which provides:  "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational.  Examples of a common benefit that are more than reputational may include,

but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

"[A]bsent evidence to the contrary, [we presume] the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date. [Citations.] This principle also applies when an enhancement has been amended to redefine to an appellant's benefit the conduct subject to the enhancement." (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 344.) Additionally, " '[a] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending case.' " (*Ibid.*) "Assembly Bill [No.] 333 increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement." (*Ibid.*) Accordingly, we agree with defendant and the Attorney General that defendant is entitled to the benefit of this change in law.

## B.    Analysis

On counts 5, 14, and 16, defendant was convicted of active participation in a criminal street gang. (§ 186.22, subd. (a).) On counts 1 through 4, 6 through 13, and 15, the jury found gang enhancements to be true. (§ 186.22, subd. (b).) On counts 1 and 3, the jury found true firearm enhancements pursuant to section 12022.53, subdivision (e), which require proof that defendant violated subdivision (b) of section 186.22. (§ 12022.53, subd. (e)(1)(A).)

When the jury was instructed in this case in 2016, it was not instructed on the new requirements of Assembly Bill No. 333. Instead, the jury was instructed it could rely on crimes committed on separate occasions or by two or more persons to establish a pattern of criminal gang activity. In addition, the jury was instructed it could consider the crimes charged in the instant case in deciding whether a pattern of criminal gang activity had

been proved. Furthermore, the instructions did not require the jury to find that the predicate offenses commonly benefited the gang or that such benefit was more than reputational.

Furthermore, as the People concede, the trial evidence does not satisfy the new requirements of Assembly Bill No. 333. The prosecution's gang expert testified to two predicate offenses, each of which was alleged to have been committed by individual gang members. The parties stipulated to an additional offense committed by defendant. The prosecutor argued the jury could find a pattern of criminal gang activity based on these three predicates. However, no evidence established these predicate offenses were committed by gang members collectively, or that the offenses collectively benefited the gang in a way that was more than reputational. Additionally, as to the gang enhancement to the assault alleged in count 15, the prosecution's expert testified only that the gang benefited reputationally from the assault, and the prosecutor argued this reputational benefit was sufficient to sustain the gang enhancement.

We therefore must reverse the convictions for active participation in a criminal street gang on counts 5, 14, and 16; the true findings on the gang enhancements to counts 1 through 4, 6 through 13, and 15; and the true findings on the firearm enhancements to counts 1 and 3. The matter will be remanded to give the People the opportunity to prove the offenses and the applicability of the enhancements under the amendments to section 186.22. (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.)

**VI**

**SENTENCING ISSUES**

A.  **Full Resentencing Required**

In our prior opinion, we noted the trial court erroneously imposed a four-year term pursuant to section 186.22, subdivision (b)(1)(A) for the gang enhancement on each of counts 6 through 9 and 15. Rather, section 186.22, subdivision (b)(5) is the applicable subdivision, and provides for a minimum term of 15 years before defendant can be

53.

considered for parole. (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1004, 1007; *People v. Williams* (2014) 227 Cal.App.4th 733, 739-740, 744-745.) Because the error affected multiple counts, the Attorney General requested that the matter be remanded for resentencing. In light of this and our prior reversal of the conviction on count 3, we found it appropriate to vacate the sentence in its entirety and remand the matter for further proceedings on count 3, if any, and for a full resentencing.

The sentencing issue pertaining to the section 186.22, subdivision (b)(1)(A) term is now moot because we have reversed all the affected gang enhancements.[33] Indeed, we have reversed defendant's conviction on counts 3, 5, 14, and 16; the gang enhancement findings on counts 1 through 4, 6 through 13, and 15; and the gang-related firearm enhancement findings on counts 1 and 3. In light of these reversals, we once again find it appropriate to vacate the sentence in its entirety and remand the matter for further proceedings on the reversed counts and allegations, if any, and for a full resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; see also *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

## B.    Assembly Bill No. 518

Prior to its amendment by Assembly Bill No. 518 (2021-2022 Reg. Sess.), statutes 2021, chapter 441 (Assembly Bill No. 518), section 654 provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case

---

[33] Likewise, the parties arguments with regard to Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018) are moot because we have reversed the firearm enhancements.

shall the act or omission be punished under more than one provision." (§ 654, former subd. (a).)

Assembly Bill No. 518 amended section 654 effective January 1, 2022, to provide, in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Thus, a trial court is no longer required to impose a sentence under the offense providing for the longest possible sentence but may sentence a defendant under any one of the applicable offenses. Assembly Bill No. 518 "provides the trial court new discretion to impose a lower sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) The Attorney General concedes Assembly Bill No. 518 applies retroactively to defendant's case. (See *People v. Mani*, at p. 379; *In re Estrada* (1965) 63 Cal.2d 740, 744–746.)

With the passage of Assembly Bill No. 518, the court now has discretion to choose to stay the longer term or terms and impose a lower sentence. However, under the law in effect at the time of sentencing, the trial court was required to impose sentence on count 1 and impose and stay sentence on count 2; impose sentence on count 3 and impose and stay sentence on counts 4 and 5; impose sentence on counts 6 through 9 and impose and stay sentence on counts 10 through 14; and to impose sentence on count 15 and impose and stay sentence on count 16. The court also stayed, pursuant to section 654, enhancements to the stayed counts (§§ 186.22, subd. (b)(1), 667, subd. (a)(1)).[34] Although we have reversed several of the affected convictions and enhancements, defendant is entitled on remand to the benefit of Assembly Bill No. 518, to the extent applicable. (*People v. Mani*, *supra*, 74 Cal.App.5th at p. 379.)

---

[34] The court also stayed the gang-related firearm enhancements to count 1 pursuant section 12022.53, subdivision (f).

## C.     Senate Bill No. 567

The trial court imposed an upper term sentence of six years on count 17.  As aggravating factors, the trial court relied on defendant's violent conduct indicating a serious danger to society based on his current offense and prior convictions, the number and seriousness of his sustained juvenile petitions and adult convictions, his having been on parole at the time he committed the offenses, and his unsatisfactory prior performance on parole and probation.

Prior to its amendment by Senate Bill No. 567 (2021-2022 Reg. Sess.), statutes 2021, chapter 731 (Senate Bill No. 567), section 1170 provided, in relevant part:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."  (§ 1170, former subd. (b).)  With the passage of Senate Bill No. 567, section 1170 now provides, in relevant part:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."  (§ 1170, subd. (b)(1).)  The exceptions in subdivision (b)(2) of section 1170 provide, in part, that the court may exceed the middle term "only when there are circumstances in aggravation of the crime that justify" the greater sentence and where "the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subd. (b)(2).)  Except in the case of enhancements, a court is also permitted to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (§ 1170, subd. (b)(3).)  A court continues to have the discretion (and, in some cases, is mandated) to impose the lower of the three specified terms when sentencing a defendant for a crime.  (§ 1170, subd. (b)(6), (7).)

As with Assembly Bill No. 518, the Attorney General concedes Senate Bill No. 567 applies retroactively to defendant's case. (See *In re Estrada*, *supra*, 63 Cal.2d at pp. 744–746.) Defendant is entitled to the benefit of Senate Bill No. 567 on remand.

D.     **Assembly Bill No. 124**

Defendant was 21 years old at the time he committed the offense alleged in count 17, for which he was sentenced to the upper term of six years.

Assembly Bill No. 124 (2021-2022 Reg. Sess.), statutes 2021, chapter 695 (Assembly Bill No. 124) added subdivision (b)(6) to section 1170, which now provides that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) *The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.* [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (Italics added.) Assembly Bill No. 124 also added section 1016.7, which provides that the term "youth" is defined as "any person under 26 years of age on the date the offense was committed." (§ 1016.7, subd. (b)(6).)

Once again, the Attorney General concedes Assembly Bill No. 124 applies retroactively to defendant's case. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *In re Estrada*, *supra*, 63 Cal.2d at pp. 744–746.) Defendant is entitled to the benefit of Assembly Bill No. 124 on remand.

57.

E.    **<u>Senate Bill No. 81</u>**

Following a bifurcated court trial, defendant was found to have suffered two prior convictions for serious felonies (§ 667, subd. (a)(1)) that were also strikes (*id*., subds. (b)-(i)).

Senate Bill No. 81 (2021-2022 Reg. Sess.), statues 2021, chapter 721 (Senate Bill No. 81) added subdivision (c)(1) to section 1385 to provide:  "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."  It also added subdivision (c)(2), which provides that "the court shall consider and afford great weight to evidence offered by the defendant to prove" various "mitigating circumstances . . . .  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  Defendant contends the following mitigating circumstances, enumerated in subdivision (c)(2), are relevant in this case:  "(B) Multiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed.  [¶]  (C) The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed.  [¶] . . . [¶]  (F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5."  (§ 1385, subd. (c)(2).)

Senate Bill No. 81 also added subdivision (c)(7) to section 1385, which provides:  "This subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision."  The act was effective January 1, 2022.  (Cal. Const., art. IV, § 8, subd. (c)(2).)  Based on subdivision (c)(7) of section 1385, the Attorney General argues Senate Bill No. 81 does not apply retroactively to defendant's sentence.  However, because we have vacated the sentence and will remand for a full resentencing (*People v. Buycks*, *supra*, 5 Cal.5th at p. 893), Senate Bill No. 81 will apply (*People v. Sek* (2022) 74 Cal.App.5th 657, 804-805).

**F.      Assembly Bill No. 1869**

The trial court imposed a booking fee of $108.19, payable to the City of Madera pursuant to Government Code section 29550.2.

Effective July 1, 2021, Assembly Bill No. 1869 (2019-2020 Reg. Sess.), statutes 2020, chapter 92, section 25 (Assembly Bill No. 1869) repealed Government Code section 29550.2.  Additionally, Assembly Bill No. 1869 added Government Code section 6111, which provides:  "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to [Government Code s]ection 27712, subdivision (c) or (f) of [Government Code s]ection 29550, and [Government Code s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."  (Stats. 2020, ch. 92, § 11.)

On remand, defendant is entitled to the application of Assembly Bill No. 1869, and any unpaid balance on the booking fee, as of July 1, 2021, is unenforceable and uncollectible.  (See *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.)

**G.      Senate Bill No. 1393**

In resentencing defendant, the court shall exercise its discretion, under sections 667, subdivision (a)(1) and 1385, as amended by Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1013, §§ 1-2, eff. Jan. 1, 2019), to determine whether to strike any of the enhancements imposed pursuant to section 667, subdivision (a)(1).[35]

---

[35] The Attorney General again concedes retroactivity, but previously argued remand was not warranted.  Since the matter is being remanded in any event, we see no reason why the trial court should not be permitted to exercise its discretion with respect to all matters as to which that discretion now exists.  Accordingly, defendant may seek relief in the trial court under the law in effect at the time of the further proceedings.  As of now, issues concerning defendant's entitlement to relief, if any, under changes in the law that occurred after he was sentenced and that are not addressed in this opinion, are not ripe for our consideration.

**H.      Errors in Abstracts of Judgment**

Defendant claims the determinate and indeterminate abstracts of judgment must be corrected on multiple points.  We assume the abstracts of judgment that are prepared following remand will fully and accurately reflect the terms imposed by the trial court.

## DISPOSITION

The convictions on counts 3, 5, 14, and 16 are reversed.  The true findings on the gang enhancements (§ 186.22, subd. (b)) to counts 1 through 4, 6 through 13, and 15, and the gang-related firearm enhancements (§ 12022.53) to counts 1 and 3 also are reversed.  Sentence is vacated in its entirety and the matter is remanded for further proceedings and/or resentencing in accordance with this opinion.

In all other respects, the judgment is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


SNAUFFER, J.

60.